## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **SENIOR LIFE YORK, INC.,** | : | **CIVIL ACTION NO. 1:19-CV-1737** |
| | : | |
| **Plaintiff** | : | **(Chief Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **ALEX M. AZAR, II, Secretary,** | : | |
| **United States Department of** | : | |
| **Health and Human Services, and** | : | |
| **SEEMA VERMA, Administrator,** | : | |
| **Centers for Medicare and Medicaid** | : | |
| **Services,** | : | |
| | : | |
| **Defendants** | : | |

## <u>MEMORANDUM</u>

Senior Life York, Inc. ("Senior Life") is a healthcare provider. It participates in federally subsidized programs administered by Alex M. Azar, II, the Secretary of the United States Department of Health and Human Services, and Seema Verma, the Administrator of the United States Centers for Medicare and Medicaid ("CMS") (collectively, "defendants"). After an audit, but before an evidentiary hearing, CMS suspended Senior Life's ability to enroll new Medicare patients.

Senior Life filed a complaint and motion for preliminary injunction. It seeks temporary reinstatement of its right to enroll Medicare patients pending an evidentiary hearing and corresponding decision by CMS. Defendants move to dismiss Senior Life's complaint for lack of jurisdiction, and alternatively oppose the preliminary injunction. We will grant in part and deny in part defendants' motion to dismiss. We will deny Senior Life's motion for preliminary injunction.

## I.     Factual Background & Procedural History

Senior Life is a healthcare provider under the Program of All-Inclusive Care for the Elderly ("PACE"). (Doc. 1 ¶ 1). As part of this program, Senior Life provides medical services to Medicare patients in their communities. (Id. ¶ 9). PACE providers are subject to various statutory and regulatory constraints that ensure they provide adequate and safe healthcare. See, e.g., 42 C.F.R. § 460.40 (PACE regulations). CMS can sanction PACE providers that violate these statutory and regulatory constraints. See 42 C.F.R. § 460.42.

### A.     PACE

CMS can "suspend enrollment of Medicare beneficiaries after the date CMS notifies the organization of the violation" if a provider does not meet certain regulatory requirements. 42 C.F.R. § 460.42(a). Specifically, CMS can suspend enrollment when it concludes a provider "[f]ails substantially to provide to a participant medically necessary items and services that are covered PACE services, if the failure has adversely affected (or has substantial likelihood of adversely affecting) the participant." Id. § 460.40(a)(1). A suspension remains in effect "until CMS is satisfied" that the provider has "corrected the cause of the violation" and the violation is "not likely to recur." Id. § 460.42(c); see also id. §§ 422.750, 756(c)(3).

Before imposing a suspension, CMS must give the provider written notice of the basis for the sanction and inform them of their right to a hearing. Id. § 422.756(a)(1). CMS must also give the provider 10 days after receipt of the notice to respond, id. § 422.756(a)(2), and the provider may request a hearing within 15

days, id. § 422.756(b)(2).  A request for a hearing does not delay the sanction's effective date.  Id. § 422.756(b)(3).

**B.    Senior Life Audit & Sanction**

CMS and the Pennsylvania Department of Human Services performed joint audits of Senior Life in February and March of 2019.  (Doc. 1-3 at 1).  After each audit, CMS held exit interviews during which its auditors informed Senior Life of their general concerns regarding its performance.  (Doc. 1-6 at 1; Hr'g Tr. 18:10-17).[1] After the field audits, Senior Life and CMS engaged in what is called a Root Cause Analysis.  (Doc. 1-6 at 1).  During that process, "CMS provided Senior LIFE York with the cases and the issue[s] that caused those cases to fail during the audit."  (Id.) Senior Life responded to each Root Cause Analysis and "self-disclosed cases that support the violations cited in the sanction notice and the audit report."  (Id.)

On August 22, 2019, CMS issued its Sanction Notice to Senior Life.  The Sanction Notice informed Senior Life that its right to enroll new Medicare patients would be suspended as of August 23, 2019.  (Doc. 1-3).  The Notice further informed Senior Life that its facilities suffered from "severe deficiencies."  (Id.)  Specifically, Senior Life had "failed substantially to provide its participants with medically necessary items and services that are covered PACE services, which adversely affected (or had the substantial likelihood of adversely affecting) its participants."

---

[1] The court reporter has provided the court with a rough transcript of the October 31, 2019 hearing and argument.  Citations thereto are abbreviated as "Hr'g Tr. __:__."  Pagination of the rough draft may vary from pagination of the official transcript.

(Id.)  The Sanction Notice summarized the alleged violations and identified relevant statutory sections or regulations allegedly violated, but it did not include patient identifiers or file numbers.  (Id. at 4-9).  The Notice also advised Senior Life of its right to submit a Corrective Action Plan "demonstrating to CMS that the underlying deficiencies have been corrected and are not likely to recur," to submit a written rebuttal, and to request a hearing.  (Id. at 9-10).

On August 27, 2019, CMS issued its Draft Audit Report, outlining the alleged violations in more detail.  (Doc. 17-3).  On September 3, 2019, Senior Life submitted its written rebuttal to the Sanction Notice and requested a stay of the sanction until a decision on its rebuttal.  (Docs. 1-4, 1-5).  Senior Life requested an administrative hearing on September 9, 2019.  (Doc. 1 at ¶ 25).  On September 18, 2019, CMS responded to Senior Life's written rebuttal and its request for a stay.  (Doc. 1-6).  CMS effectively rejected Senior Life's stay request by reinforcing its sanction decision.  (Id.)  It also explained that CMS had notified Senior Life of its findings and the cases used to support its findings verbally during an exit interview.  (Id.)

Senior Life submitted its Corrective Action Plan on September 13, 2019.  (Doc. 1 ¶ 17).  Senior Life and CMS are still participating in the Corrective Action Plan process.  (Hr'g Tr. 62:10-63:4).  A hearing regarding Senior Life's sanctions took place on November 4-6, 2019.  (Doc. 1 ¶ 27).

### C.    Procedural History

Senior Life filed a complaint and a motion for preliminary injunction. Defendants responded with a motion to dismiss for lack of subject-matter

jurisdiction.  We ordered expedited briefing on both motions and held an

evidentiary hearing and oral argument.  The motions are ripe for disposition.

## II.  **Legal Standard**

### A.  **Motion to Dismiss—Rule 12(b)(1)**

Federal Rule of Civil Procedure 12(b)(1) provides that a court may dismiss a

claim for lack of subject matter jurisdiction.  <u>See</u> FED. R. CIV. P. 12(b)(1).  Such

jurisdictional challenges take of one two forms: (1) parties may levy a "factual"

attack, arguing that one or more of the pleading's factual allegations are untrue,

removing the action from the court's jurisdictional ken; or (2) they may assert a

"facial" challenge, which assumes the veracity of the complaint's allegations but

nonetheless argues that a claim is not within the court's jurisdiction.  <u>Lincoln</u>

<u>Benefit Life Co. v. AEI Life, LLC</u>, 800 F.3d 99, 105 (3d Cir. 2015) (quoting <u>CNA v.</u>

<u>United States</u>, 535 F.3d 132, 139 (3d Cir. 2008)).  In either instance, it is the plaintiff's

burden to establish jurisdiction.  <u>See</u> <u>Mortensen v. First Fed. Sav. & Loan Ass'n</u>,

549 F.2d 884, 891 (3d Cir. 1977).

A factual challenge allows the defendant to present competing evidence to

disprove a plaintiff's underlying assertion in its complaint that there is jurisdiction.

<u>Constitution Party of Pa. v. Aichele</u>, 757 F.3d 347, 358 (3d Cir. 2014).  The plaintiff

maintains the burden of proving jurisdiction, but the court "is free to weigh the

evidence and satisfy itself as to the existence of its power to hear the case," and "no

presumptive truthfulness attaches to [the] plaintiff's allegations …."  <u>Mortensen,</u>

549 F.3d at 891.  The court may also "weigh and consider evidence outside the pleadings."  <u>Constitution Party</u>, 757 F.3d at 358.

**B.      Motion for Preliminary Injunction—Rule 65**

The court applies a four-factor test in determining the propriety of injunctive relief.  The movant must, as a threshold matter, establish the two "most critical" factors: likelihood of success on the merits and irreparable harm.  <u>Reilly v. City of Harrisburg</u>, 858 F.3d 173, 179 (3d Cir. 2017).  Under the first factor, the movant must show that "it can win on the merits."  <u>Id.</u>  This showing must be "significantly better than negligible but not necessarily more likely than not."  <u>Id.</u>  The second factor carries a slightly enhanced burden: the movant must establish that it is "more likely than not" to suffer irreparable harm absent the requested relief.  <u>Id.</u>  Only if these "gateway factors" are satisfied may the court consider the third and fourth factors: the potential for harm to others if relief is granted, and whether the public interest favors injunctive relief.  <u>Id.</u> at 176, 179.  The court must then balance all four factors to determine, in its discretion, whether the circumstances favor injunctive relief.  <u>Id.</u> at 179.

**III.      <u>Discussion</u>**

Ostensibly, this is the first case in which CMS has imposed a sanction on a PACE provider, and the provider has requested a pre-sanction hearing.  (Hr'g Tr. 17:6-13).  As a threshold matter, Senior Life must establish jurisdiction.  We

therefore begin with defendants' motion to dismiss before considering whether Senior Life's procedural due process claim survives.[2]

## A. Jurisdiction

Senior Life asserts jurisdiction under both 42 U.S.C. § 1331 and 42 U.S.C. § 405. (Doc. 1 ¶ 5; Hr'g Tr. 30:4-10). Senior Life then argues that it need not exhaust administrative remedies because its claims are "collateral" to the agency's review process. Defendants claim jurisdiction is wanting on exhaustion grounds.

### 1. *Claims "Arising Under" the Medicare Act*

Parties typically assert federal-question jurisdiction under 28 U.S.C. § 1331 for claims implicating federal statutes. In the Medicare context, however, the path to jurisdiction is narrowly prescribed. Federal courts lack subject-matter jurisdiction to hear claims "arising under" the Medicare Act[3] unless the agency has made a "final decision." See Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1, 10 (2000) (citing 42 U.S.C. §§ 405(g), (h)). Section 405(h) provides:

> **(h) Finality of Commissioner's decision** … The findings and decision of the Commissioner of Social Security after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Commissioner of Social Security shall be reviewed by any person, tribunal, or governmental agency except as herein provided. *No action against the United States, the Commissioner of Social Security, or any officer or employee thereof shall be brought under Section 1331 … to recover on any claim arising under this subchapter.*

---

[2] Senior Life withdrew its mandamus claim, (Doc. 17 at 21 n.7), and conceded that its substantive due process claim is noncollateral and therefore must be exhausted through the administrative process, (Hr'g Tr. 15:13-20).

[3] Section 405(h) of the Social Security Act is incorporated into the Medicare Act by 42 U.S.C. § 1395ii.

42 U.S.C. § 405(h) (emphasis added).

Congress created a special jurisdictional foothold to establish federal-court jurisdiction. Section 405(g) states: "Any individual, after any *final decision* of the [Secretary] made after a hearing to which he was a party … may obtain a review of such decision by a civil action commenced within 60 days." Id. § 405(g) (emphasis added). Plaintiffs hoping to bring claims "arising under" the Medicare Act in federal court must therefore obtain a "final decision" from the agency and comply with Section 405's mandate.

Section 405(h)'s "arising under" language has been interpreted broadly in a trilogy of Supreme Court decisions. First, in Weinberger v. Salfi, 422 U.S. 749 (1975), then in Heckler v. Ringer, 466 U.S. 602 (1984), and most recently in Shalala v. Illinois Council on Long Term Care, Inc., 529 U.S. 1 (2000). The Salfi Court held that the phrase "arising under" implicates all claims for which the relevant act "provides both the standing and the substantive basis for the presentation" of the claim. Salfi, 422 U.S. at 760-61. The Ringer Court concluded that Section 405(h) foreclosed Section 1331 jurisdiction when the allegedly collateral claims were "inextricably intertwined" with the underlying claim for benefits. Ringer, 466 U.S. at 613-15. Again, claims must be channeled through Section 405(h) if the relevant act provides the standing and substantive basis for its presentation to the agency. Id. at 615 (citing Salfi, 422 U.S. at 760-61).

These two cases set the stage for Illinois Council, which declared that Section 405(h) "purports to make exclusive the judicial review method set forth in § 405(g)." Ill. Council, 529 U.S. at 10. Section 405(h) thus requires the "channeling" of

"virtually all legal attacks through the agency," id. at 13, and prohibits federal-question review irrespective of the nature of the claim, id. at 10.  The Court explained that its cases interpreting Section 405(h) "foreclose distinctions based upon … *the 'collateral' versus the 'noncollateral' nature of the issues*."  Id. at 13-14 (emphasis added).  To the Court, Congress had decided to preclude federal-question jurisdiction in virtually all cases "arising under" the relevant acts.  Id. at 13.

        2.        ***"Collateral" Claim Doctrine***

Despite Section 405(h)'s strict channeling requirement, the "collateral" claim doctrine recognized in Mathews v. Eldridge, 424 U.S. 319, 330-31 (1976), provides a means of waiving the exhaustion requirement to more quickly obtain a "final decision."  A final decision cannot be made without satisfying (1)  the nonwaivable "presentment" requirement and (2)  the waivable exhaustion requirement.  Id. at 328.  The parties agree that Senior Life "presented" its claim to the agency but did not exhaust its administrative remedies.  Our inquiry thus centers on whether Senior Life's procedural due process claim is sufficiently "collateral" to waive the exhaustion requirement.

Under Mathews, claims alleging a right to a predeprivation hearing are collateral (waiving the exhaustion requirement) when: (1) the constitutional claim is "entirely collateral" to the substantive claim for benefits; (2) plaintiff claims that full relief "cannot be obtained at a postdeprivation hearing"; and (3) there is a "colorable" claim that an erroneous sanction would damage the plaintiff "in a way not recompensable through retroactive payments."  Id. at 330–31.

The Salfi, Ringer, and Illinois Council trilogy did not destroy this doctrine. To the contrary, Illinois Council expressly preserved it. See Ill. Council, 529 U.S. at 14-15 (citing Mathews, 424 U.S. at 326-32); id. at 24 (citing Mathews, 424 U.S. at 330-31). In cementing Mathews, the Court explained that collateral claims may survive so long as the plaintiff was "*complying with*, rather than *disregarding*, the strictures of § 405(h)." Id. at 15 (citing Mathews, 424 U.S. at 326-27). In other words, the collateral-claim doctrine permits waiver only if the plaintiff asserts jurisdiction under Section 405. See GOS Operator, 843 F. Supp. 2d at 1230. Mathews is not a means for establishing Section 1331 jurisdiction.

That the collateral-claim doctrine survived Illinois Council is not particularly controversial. Yet courts struggle to consistently apply the doctrine.

### 3.      *Post-*Illinois Council *Tension*

The Third Circuit has not addressed the interplay between Illinois Council's "arising under" standard and Mathews' "collateral" standard. Other circuits, as well as two district courts within the Third Circuit, have addressed this question. Given the disparity in analysis, a review of a select group of cases is warranted.

The Sixth Circuit discussed the relationship between Illinois Council and the collateral claim doctrine in Cathedral Rock of North College v. Shalala, 223 F.3d 354 (6th Cir. 2000). The Court concluded that Mathews does not create an exception to Sections 405(g) and (h). Id. at 362 (citing Ill. Council, 529 U.S. at 13-14). Instead, it allows for waiver of administrative procedures to more quickly obtain a "final decision." Id. Cathedral Rock described the collateral procedural due process claim in Mathews as one that required "analysis of the Supreme Court's

10

jurisprudence on the Due Process Clause, which involved completely separate issues than his challenge to the Secretary's decision to terminate benefits." Id. at 363. According to the Sixth Circuit, courts must therefore ask "whether the allegedly collateral claim involves completely separate issues from the party's claim that it is entitled to … continued participation in the Medicare program or whether it is inextricably intertwined with its substantive claim to … participation." Id.

More recently, the Fifth Circuit in Family Rehabilitation, Inc. v. Azar, 886 F.3d 496 (5th Cir. 2018), held that the district court had jurisdiction to hear a procedural due process claim seeking suspension of recoupment pending a hearing, even though the plaintiff had not exhausted its administrative remedies. Id. at 500-04. Like the procedural due process claim in Mathews, which also sought a temporary reinstatement of benefits pending an evidentiary hearing, the plaintiff's procedural due process claim was collateral. Id.

In making this decision, the Fifth Circuit reviewed two Supreme Court cases: Ringer and Bowen v. City of New York, 476 U.S. 467 (1986). In Ringer, the plaintiffs asked the court to declare the agency's policy unlawful and that their benefits were reimbursable. Family Rehab., 886 F.3d at 502 (citing Ringer, 466 U.S. at 614). Their claim was simply thus "a claim that they should be paid" and therefore "inextricably intertwined" with the benefits claim. Id. (citing Ringer, 466 U.S. at 614) (internal quotations omitted). In Bowen, the plaintiff alleged that the agency violated due process by employing an unwritten policy. Id. (citing Bowen, 476 U.S. at 473-74). That claim was collateral because it did not seek benefits—it

simply challenged the agency's failure to follow its regulations. Id. (citing Bowen, 476 U.S. at 483).

Synthesizing these cases, along with Mathews and Fifth Circuit precedent, the Fifth Circuit concluded that a claim is collateral if it does not require the court to "examine the merits of the underlying dispute, delve into the statute and regulations, or make independent judgments as to plaintiffs' eligibility under a statute." Id. at 503 (citing Ringer, 466 U.S. at 614; Affiliated Prof'l Home Health Care Agency v. Shalala, 164 F.3d 282, 284-85 (5th Cir. 1999)). Collateral claims, the court explained, must present constitutional or procedural challenges and request temporary relief until the agency follows required procedures. Id. (citing Bowen, 476 U.S. at 483; Ringer, 466 U.S. at 614; Mathews, 424 U.S. at 330-32; Affiliated Prof'l, 164 F.3d at 284-85). The court held that collateral claims cannot request permanent reinstatement of benefits. Id. (citing Ringer, 466 U.S. at 614; Affiliated Prof'l, 164 F.3d at 284-85). Being presented with a procedural due process claim requesting a temporary reinstatement pending an agency hearing, the Fifth Circuit held that jurisdiction was proper. Id.

Two district courts in the Third Circuit, both relied upon by defendants, have taken a different tack at interpreting the interplay between Illinois Council and Mathews. See Athens Healthcare, Inc. v. Sebelius, No. 3:13-1443, 2013 WL 2403578, at *3-5 (M.D. Pa. May 31, 2013); Trade Around the World of PA v. Shalala, 145 F. Supp. 2d 653, 658 (W.D. Pa. 2001). Both cases involved providers operating nursing facilities for Medicare recipients. Athens Healthcare, 2013 WL 2403578, at *1; Trade Around the World, 145 F. Supp. 2d at 657. Both providers' contracts were

terminated after they were cited for Medicare violations. <u>Athens Healthcare</u>, 2013 WL 2403578, at *1; <u>Trade Around the World</u>, 145 F. Supp. 2d at 657.

The <u>Athens Healthcare</u> provider brought procedural due process, substantive due process, and *ultra vires* claims under Section 1331. <u>Athens Healthcare</u>, 2013 WL 2403578, at *2. The provider argued that CMS lacked authority to terminate the provider agreement, did not give proper notice, and abused its discretion in terminating plaintiff's agreement. <u>Id.</u> The <u>Athens Healthcare</u> provider sought a temporary reinstatement of benefits pending a hearing. <u>Id.</u> at *4. They argued its claim was collateral because it was only asking the court to enforce the *status quo* during the administrative process, not to review the merits of the administrative appeal. <u>Id.</u> The court rejected this argument: "[T]he fact remains that a decision in favor of the plaintiff here would have the same consequence as a favorable decision by the administrative agency in the appeal, namely, continuation of the plaintiff in the Medicare and Medicaid systems." <u>Id.</u>

The <u>Trade Around the World</u> provider also unsuccessfully argued that its claims were collateral. <u>Trade Around the World</u>, 145 F. Supp. 2d at 664. The court held that it lacked jurisdiction to hear the provider's claim that CMS unconstitutionally exceeded its statutory authority in terminating the provider's access to benefits. <u>Id.</u> at 657. To the court, the provider's sole goal of "reestablishing the previous benefits of its position as a Medicare/Medicaid provider" distinguished <u>Mathews</u>. <u>Id.</u> at 664. The court focused on the potential outcome: "[A] favorable resolution of Plaintiff's claim here would result in

continued participation in the Medicare/Medicaid program, the same resolution it seeks in the administrative appeal; therefore, the due process claim cannot be considered entirely collateral even though the grounds on which Plaintiff bases the two claims may differ." Id. (citing Cathedral Rock, 223 F.3d at 354). This rendered plaintiff's claim "inextricably intertwined" with its claim for benefits because it sought "a finding that Defendants exceeded their authority in terminating the provider agreements." Id. at 664 (citing Ringer, 466 U.S. at 614-15). In further support, the court invoked Illinois Council's sweeping language disavowing distinctions between collateral and noncollateral claims. Id. at 660-61 (citing Ill. Council, 529 U.S. at 24-25).

### 4. Summary and Application

With that background, we turn to the case before us. We are unpersuaded by defendants' reliance on Athens Healthcare and Trade Around the World. The Athens Healthcare plaintiff brought a procedural due process claim (among others) seeking a temporary stay of its sanction pending an evidentiary hearing. Athens Healthcare, 2013 WL 2403578, at *4. The court cited nothing for its statement that a favorable outcome for the plaintiff would have the "same consequence" as success before the agency. Id. The provider's request was limited in scope—it sought *temporary* relief, not *permanent* relief. Judicial intervention would not have overridden the agency's power to decide the merits of the benefits claim or to "apply, interpret, or revise policies, regulations, or statutes." Ill. Council, 529 U.S. at 13. And Trade Around the World is distinguishable. The provider there sought relief (permanent declaration that the agency acted beyond its statutory scope)

entirely different from the relief sought here (temporary relief from the sanction pending a hearing). Trade Around the World, 145 F. Supp. 2d at 657. To grant such relief would require the court to review the agency's decisionmaking, the relevant statutes and regulations, and the facts central to the sanction decision. Substantive benefits-based review is deferred to the agency.

The Fifth Circuit's approach is more logically-sound and consistent with Mathews and Illinois Council. Specifically, we agree with the analysis of Family Rehabilitation and courts that review the *claim* brought and the analysis implicated, not solely the *outcome* of a finding for the plaintiff. See Family Rehab., 886 F.3d at 503; see also Blue Valley Hosp., Inc. v. Azar, 919 F.3d 1278, 1285 (10th Cir. 2019); GOS Operator, 843 F. Supp. 2d at 1228-32. The constitutional challenge in Mathews was entirely collateral despite the fact that a finding for the plaintiff would result in a temporary reinstatement of benefits. It was collateral because it called for analysis of constitutional doctrines unrelated to the benefits claim. The temporary versus permanent distinction is simply a means of smoking out disguised claims for benefits. The Fifth Circuit's distinction reinforces balance between the agency's right of review and the federal judiciary's right to enforce constitutional standards. See Ill. Council, 529 U.S. at 24.

Accordingly, a collateral claim must not ask the court to wade into the "merits of the underlying dispute, delve into the statute and regulations, or make independent judgments as to plaintiffs' eligibility under a statute." Family Rehab., 886 F.3d at 503 (citing Ringer, 466 U.S. at 614; Affiliated Prof'l, 164 F.3d at 284-85); see also Mathews, 424 U.S. at 330-32; Blue Valley, 919 F.3d at 1285; Cathedral Rock,

223 F.3d at 363.  The claim must "sound only in constitutional or procedural law" and seek temporary, not permanent, relief.  Id. (citing Mathews, 424 U.S. at 330-32; Bowen, 476 U.S. at 483; Ringer, 466 U.S. at 614; Affiliated Prof'l, 164 F.3d at 284-85); see also Blue Valley, 919 F.3d at 1285.

We have jurisdiction to entertain Senior Life's procedural due process claim under the test described above.  Senior Life's claim—which only requires us to analyze procedural due process jurisprudence—does not require us to delve into CMS's regulatory power.  Similarly, we need not consider the merits of Senior Life's claim for benefits that has been filed with the agency and is the subject of ongoing proceedings.

In addition, Senior Life's procedural due process claim seeks temporary, not permanent, relief.  Our review therefore does not amount to a declaration as to the propriety of the agency's sanction.  The Fifth Circuit aptly recognized such a distinction in Family Rehabilitation, when it synthesized Supreme Court cases Mathews, Ringer, and Bowen, as well as its own precedent in Affiliated Professional.  The resulting limitation appropriately responds to the Supreme Court's direction that the agency be allowed to conduct its administrative review and independently "reconsider its policies, interpretations, and regulations in light of those challenges."  Ill. Council, 529 U.S. at 24.

Senior Life also presents a colorable showing of irreparable harm.  Senior Life must show that an erroneous deprivation would "damage [plaintiff] in a way

not recompensable through retroactive payments."[4] <u>Family Rehab.</u>, 886 F.3d at 504 (quoting <u>Mathews</u>, 424 U.S. at 331).  That alleged harm must be "sufficiently serious," <u>Kreschollek v. S. Stevedoring Co.</u>, 78 F.3d 868, 875 (3d Cir. 1996), and not immaterial or "wholly insubstantial and frivolous," <u>Arbaugh v. Y& H Corp.</u>, 546 U.S. 500, 513 n.10 (2006) (citation omitted).  Only then is a claim truly collateral as contemplated by <u>Mathews</u>.  And only then can the court waive the exhaustion requirement and find a "final decision" sufficient to establish jurisdiction.

Senior Life alleges three harms: (a) financial harm; (b) reputational harm; and (c) harm to its employees and future patients.  First, Senior Life alleges that its business is entirely reliant upon PACE enrollment and participation.  (Doc. 1 ¶ 34). Senior Life claims that, prior to the sanction, it enrolled approximately ten new Medicare patients per month, (<u>id.</u> ¶ 36), each of whom generated roughly $7,000 in monthly revenue, (Hr'g Tr. 52:3-8).  After adjusting for attrition, Senior Life estimates that it will suffer lost revenue of roughly $120,000 per month and $1.4 million over the one year it expects to wait before the agency rules on its sanction. (Doc. 1 ¶¶ 36-39).  This, it claims, will cause a 25% reduction in its current operations.   (<u>Id.</u> ¶¶ 39, 40).

---

[4] Some courts construing <u>Mathews</u>' "colorable" requirement have assessed the merits of the constitutional claim rather than the extent of the plaintiff's alleged harm.  <u>See</u>, <u>e.g.</u>, <u>Blue Valley</u>, 919 F.3d at 1286-87; <u>Cathedral Rock</u>, 223 F.3d at 364-66.  A plain reading of <u>Mathews</u>, however, directs otherwise.  <u>See</u>, <u>e.g.</u>, <u>Family Rehab.</u>, 886 F.3d at 504; <u>GOS Operator, LLC v. Sebelius</u>, 843 F. Supp. 2d at 1230–31 (S.D. Ala. 2012) (citing <u>Thunder Basin Coal Co. v. Reich</u>, 510 U.S. 200, 213 (1994)); <u>see</u> <u>also</u> <u>Kreschollek</u>, 78 F.3d at 875.

Second, Senior Life alleges that the sanction "will have immediate and incalculable adverse impacts on [Senior Life's] reputation and standing within the community and the industry." (Id. ¶ 41). Finally, Senior Life argues the sanction will harm Senior Life employees, who may lose their jobs as a result of a reduced participant census. (Id. ¶ 40). It will also harm "would-be participants," who "will be denied their full choice of programs" during the suspension. (Id. ¶¶ 42). Senior Life describes itself as an all-inclusive care provider that connects its participants to a wide range of medical and community resources, many of which are unavailable from alternative nursing services. (Hr'g Tr. 33:23-34-19). According to Senior Life, the sanction has and will continue to cause "substantial … permanent" losses that "cannot be recovered." (Doc. 1 ¶ 37).

After weighing and considering the evidence from the pleadings and the October 31 proceeding, see Davis v. Wells Fargo, 824 F.3d 333, 346 (3d Cir. 2016), we conclude that Senior Life's allegations of harm to its financial solvency, reputation, employees, and future patients are "sufficiently serious," Kreschollek, 78 F.3d at 875, and not immaterial or "wholly insubstantial and frivolous," Arbaugh, 546 U.S. at 513 n.10. Defendants seek to minimize Senior Life's harm by pointing to the temporary nature of the sanction and the possibility of recovery for lost enrollments. (Hr'g Tr. 103:24-104:1). Senior Life cannot, however, receive after-the-fact payments for enrollments it is unable to capture during the sanction period. its alleged injuries are not recompensable through retroactive payments, satisfying Mathews' requirement for a "colorable" showing of irreparable harm. See Family Rehab., 886 F.3d at 504. Because Senior Life's claim to a predeprivation hearing is

"entirely collateral" and is accompanied by a "colorable claim" of irreparable harm, see Mathews, 424 U.S. at 330-31, we have jurisdiction. We thus move on to Senior Life's motion for preliminary injunction.

**B.     Preliminary Injunction**

Senior Life argues that they are likely to succeed on their theory that the Constitution requires a predeprivation hearing and more process. (Doc. 1 ¶¶ 31, 49, 56, 60; Doc. 17 at 22). Defendants think otherwise.

Procedural due process protections are implicated only when government action deprives one of a constitutionally protected interest. See Tundo v. Cty. of Passaic, 923 F.3d 283, 287 (3d Cir. 2019). A protected interest requires "a legitimate claim of entitlement." Id. (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)). Defendants argue that Senior Life has no protected interest in participation in federal healthcare programs. (Doc. 26 at 22 (citing Parrino v. Price,

869 F.3d 392, 397 (6th Cir. 2017)).  We need not resolve this issue because, as

discussed below, Senior Life's claim fails for other reasons.[5]

Assuming there is a protected interest, courts look to three factors to

determine what procedural protections are constitutionally required: (a) the

"private interest"; (b) the "risk of an erroneous deprivation" and "the probable

value, if any, of additional or substitute procedural safeguards"; and (c) the

"[g]overnment's interest, including the function involved and the fiscal and

administrative burdens that the additional or substitute procedural requirement

would entail."  Mathews, 424 U.S. at 335.

Senior Life's alleged private interests—financial harm and patient-borne

burdens—are not compelling.  Private interests that relate to "life's necessities"

create a strong private interest.  Saucon Valley Manor, Inc. v. Miller, 392 F. Supp.

---

[5] Neither the court nor the parties have identified analogous caselaw involving the suspension of PACE benefits.  Ongoing contracts can create a protected property interest.  See Unger v. Nat'l Residents Matching Program, 928 F.2d 1392, 1397 (3d Cir. 1991) (citing Perry v. Sindermann, 408 U.S. 593, 599–601 (1972)).  Yet no protected interest exists when the government can terminate a relationship in its discretion or at-will.  Tundo, 923 F.3d at 287 (citing Anderson v. City of Philadelphia, 845 F.2d 1216, 1221 (3d Cir. 1988)).  We note that cases involving CMS sanctions have held that participation in federal healthcare programs is not a protected interest.  See, e.g., Shah v. Azar, 920 F.3d 987, 997-98 (5th Cir. 2019); Parrino, 869 F.3d at 397 (collecting cases); In Touch Home Health Agency, Inc. v. Azar, No. 19 C 1545, 2019 WL 5456991, at *8-10 (N.D. Ill. Oct. 24, 2019) (collecting cases).  It appears that courts in the Third Circuit have not resolved this issue.  See River Nile Invalid Coach & Ambulance, Inc. v. Velez, 601 F. Supp. 2d 609, 617-20 (D.N.J. 2009); Temple Univ. of Commonwealth Sys. of Higher Educ. ex rel. Temple Univ. Clinical Facility Practice Plans v. Brown, No. 00-CV-1063, 2001 WL 185535, at *11 n.4 (E.D. Pa. Feb. 23, 2001); Hillman Rehab. Ctr. v. U.S., Dep't of HHS, No. 98-3789, 1999 WL 34813783, at *17-18 (D.N.J. May 13, 1999); Rite Aid of Pa., Inc. v. Houstoun, 998 F. Supp. 522, 531 (E.D. Pa. 1997); Hussain v. Sec'y of Health & Human Resources, 748 F. Supp. 277, 279 (D.N.J 1990).

3d 554, 574 (E.D. Pa. 2019) (quoting Graham v. Office of Surface Mining Reclamation & Enf't, 722 F.2d 1106, 1111 (3d Cir. 1983)).  Business or pecuniary interests carry a less weighty private interest.  Id. (citing Mathews, 424 U.S. at 340); see also Minard Run Oil Co. v. U.S. Forest Serv., 670 F.3d 236, 255 (3d Cir. 2011).  Senior Life alleges a significant pecuniary interest, but a pecuniary interest nonetheless.  (Doc. 1 ¶¶ 34-39).  And the sanction imposed in the instant matter does not prevent Senior Life from receiving payments for current patients.  Moreover, the Medicare system is designed to benefit patients, not providers.  See Town Court, 586 F.2d at 277.  Senior Life's financial interest in being subsidized under the program is thus "incidental" to Medicare's overarching aims.  Cathedral Rock, 223 F.3d at 365 (citing Town Court, 586 F.2d at 277).  Senior Life's claimed financial hardship stands in stark contrast to the interests of the plaintiff seeking disability benefits in Matthews.  See Town Court, 586 F.2d at 277.

Senior Life also alleges that the sanction will have an "immediate and incalculable" negative impact on its reputation and standing in the community and the industry.  (Doc. 1 ¶ 41).  This general allegation of reputational harm is colorable, but it pales in comparison to the private interest in Mathews.  Unlike the plaintiff in Mathews, "[Senior Life] is a corporation claiming financial hardship; Eldridge was a private individual claiming physical disability."  See Town Court, 586 F.2d at 268.  Finally, Senior Life alleges that sanctions will harm its employees and potential future patients.  (Doc. 1 ¶¶ 40, 42-44).  Financial hardship alone is generally not enough to establish irreparable harm.  See Minard Run, 670 F.3d at 355.  We do not view speculative financial hardship to nonparties as legally relevant

to Senior Life's private interest. Senior Life's assertion of harm on behalf of potential future patients is likewise unconvincing: even if Senior Life could identify those patients, they would not have individual standing to challenge the sanction imposed on Senior Life by CMS. See O'Bannon, 447 U.S. at 787 n.17; Cathedral Rock, 223 F.3d at 364. Senior Life's assertion of a private interest on behalf of its current and potential future patients is unavailing. Cathedral Rock, 223 F.3d at 364.

The risk of erroneous deprivation is not high. We measure this risk by looking to "the type of determination that must be made and the type of evidence necessary to make that determination." Ross v. Horn, 598 F.2d 1312, 1319 (3d Cir. 1979). The risk of erroneous deprivation decreases when the process requires "rote calculations or application of facts to specifically outlined, mechanical standards." Saucon Valley Manor, 392 F. Supp. 3d at 575 (citing Mathews, 424 U.S. at 344-45). In evaluating the potential for erroneous deprivations, we also assess the adequacy of existing post-deprivation remedies. Augustin v. City of Philadelphia, 897 F.3d 142, 151 (3d Cir. 2018).

Senior Life argues that CMS's failure to follow its own procedures creates a risk of erroneous deprivation. (Hr'g Tr. at 21:2-9). We are not persuaded. Sanction determinations are often "easily documented" and "sharply focused" decisions in which "issues of credibility and veracity play little role." Town Court, 586 F.2d at 277; see also Ritter, 797 F.2d at 123. Indeed, audits are based upon "routine, standard, unbiased reports by health care professionals" who "evaluate the provider in light of well-defined criteria that were developed in the administrative rule-making process." Town Court, 586 F.2d at 277. As it relates to Senior Life, the

applicable criteria are laid out in the relevant statutes and regulations known to the entity.  (See, e.g., Doc. 1-3 at 5-9).  CMS's audit and subsequent sanction were also based in large part on the review of medical records, which do not depend on credibility determinations.  Ritter, 797 F.2d at 123.

Further, Senior Life engaged in a deliberative back-and-forth with CMS via the Root Cause Analysis process.  (Doc. 1-6 at 1).  During that process, Senior Life was apprised of "the cases and the issue[s] that caused those cases to fail during the audit."  (Id.)  Senior Life also "self-disclosed cases that support the violations cited in the sanction notice and the audit report."  (Id.)  Senior Life's opportunity to submit written submissions as part of that process is adequate to prevent erroneous deprivations.  Town Court, 586 F.2d at 277.  What is more, the procedures available to review CMS's sanction decision include a thorough, multi-step review process. See 42 C.F.R. § 422.756.  Along with the ongoing Corrective Action Plan process, the substantial documentary evidence, and the relatively little role played by credibility determinations, the process provided to Senior Life creates a low risk of erroneous deprivation.  See GOS Operator, 843 F. Supp. 2d at 1234 & n.24.

Finally, the government has a strong interest in protecting the elderly. Saucon Valley Manor, 392 F. Supp. 3d at 577.  Senior Life argues that the government's interest favors additional process because Senior Life is the only PACE provider in York and Dauphin counties.  (Doc. 17 at 29-30).  Failure to enjoin the sanction will consequently prevent the provision of PACE services to a vulnerable population, the elderly.  (Id. at 30).  But the public has a "strong interest" in ensuring that elderly patients do not receive treatment from

noncomplying providers longer than necessary. Town Court, 586 F.2d at 278. The Secretary also has an interest in ensuring that Medicare participants are provided with safe and adequate care, see GOS Operator, 843 F. Supp. 2d at 1234-35, as well as in preserving financial and administrative resources, Ritter, 797 F.2d at 123 (citing Town Court, 586 F.2d at 268).

We also reiterate: Senior Life's interest in survival is "incidental" to the government's interest in protecting citizens regulated by this scheme. Cathedral Rock, 223 F.3d at 365 (citing Northlake Comm. Hosp., 654 F.2d at 1242; Green v. Cashman, 605 F.2d 945, 946 (6th Cir. 1979)); see also id. (citing Town Court, 586 F.2d at 277). Requiring evidentiary hearings before implementing an appropriate sanction would jeopardize that interest by "allow[ing] delinquent [providers] to delay remedying a violation at the expense of its [patients'] wellbeing." Saucon Valley Manor, 392 F. Supp. 3d at 578 (citation omitted). Given the weak private interest, the low risk of erroneous deprivation, and the weighty government interest, we do not think that Senior Life is entitled to additional process.

Perhaps most tellingly, Senior Life offers no counter to the litany of cases holding that a provider is not entitled to a predeprivation evidentiary hearing. (Hr'g Tr. at 104:22-106:8). The Third Circuit has, on at least two occasions, held that the Constitution does not require a predeprivation hearing as long as some process is provided. See Ritter, 797 F.2d at 123-24; Town Court, 586 F.2d at 278. Courts throughout the federal judiciary also routinely hold that providers are not entitled to predeprivation hearings. See, e.g., O'Bannon, 447 U.S. at 784; Blue Valley Hosp., 919 F.3d at 1286-87; Oakland Med. Grp., P.C. v. Sec'y of Health and Human Servs.,

Health Care Financing Admin., 298 F.3d 507, 511 (6th Cir. 2002); Cathedral Rock,

223 F.3d at 364-65; Varandani v. Bowen, 824 F.2d 307, 310-11 (4th Cir. 1987);

Northlake Cmty. Hosp. v. United States, 654 F.2d 1234, 1241–42 (7th Cir. 1981); In

Touch Home, 2019 WL 5456991, at *8-10; Marion Nursing Ctr., 2013 WL 6019322, at

*4-5; Autumn Health Care, 959 F. Supp. 2d at 1051-53; GOS Operator, 843 F. Supp.

2d at 1233-35; Trade Around the World, 145 F. Supp. 2d at 665.

Senior Life has not shown that it has a likelihood of success on the merits of

its procedural due process claim.  Because this showing is fatal to the relief Senior

Life seeks, we do not decide whether its "colorable" claim of irreparable harm for

jurisdictional purposes clears the "more likely than not" hurdle for a preliminary

injunction. [6]

---

[6] Senior Life also seeks relief under the Declaratory Judgment Act.  28 U.S.C.
§ 2201.  The Act is not an independent source of jurisdiction.  Kelly v. Maxum
Specialty Ins. Grp., 868 F.3d 274, 281 n.4 (3d Cir. 2017).  It instead "provides a
remedy for controversies otherwise properly within the court's subject matter
jurisdiction."  Auto-Owners Ins. Co. v. Stevens & Ricci Inc., 835 F.3d 388, 394 (3d
Cir. 2016).  Senior Life's procedural due process claim does not have a likelihood of
success.  We therefore need not expand further on the parties respective "rights
and other legal relations."  28 U.S.C. § 2201.

## IV.    Conclusion

We will grant in part and deny in part defendants' motion to dismiss for lack of jurisdiction.  We will deny Senior Life's motion for preliminary injunction.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:    November 25, 2019